JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

17-cv-3793

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jack J., by and through his parents, Jennifer S. and Jeff J.

**DEFENDANTS**

Coatesville Area School District    17 3793

**(b)** County of Residence of First Listed Plaintiff   Chester
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Chester
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Michael E. Gehring, Esquire, Dennis C. McAndrews, Esquire, Michael J. Connolly, Esquire, McAndrews Law Offices, 30 Cassatt Avenue, Berwyn, PA 19312; Tele: 610-648-9300

Attorneys *(If Known)*
Anne Hendricks, Esquire, Levin Legal Group, Suite 1301, 1800 Byberry Road, Huntingdon Valley, PA 19006; Tele: 215-938-6378

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
Another District
*(specify)*

☐ 6  Multidistrict
Litigation -
Transfer

☐ 8  Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
see attached

Brief description of cause:
see attached

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $ MORE THAN $150,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

AUG 23 2017

DATE
08/23/2017

SIGNATURE OF ATTORNEY OF RECORD
*Michael E. Gehring*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

This action is maintained under the Individuals with Disabilities Education Act, 20 U.S.C. Section 1400 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794; The Americans With Disabilities Act, 42 U.S.C. Section 12101 et. seq.; and under Pennsylvania's statutes, regulations, and common law, all in order to remedy the denial of plaintiff's rights as set forth in the Complaint.

UNITED STATES DISTRICT COURT                                    **APPENDIX F**

**FOR THE ~~EASTERN~~ DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the ~~category~~ of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: Downingtown, PA                              17  3793

Address of Defendant:   3030 C.G. Zinn Road, Thorndale, PA 19372

Place of Accident, Incident or Transaction:_____
(Use Reverse Side For Additional Space)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))
Yes☐   No x

Does this case involve multidistrict litigation possibilities?                    Yes☐   No x
RELATED CASE, IF ANY:

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
                                                                    Yes☐   No x
2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated
    action in this court?                                          Yes☐   No x

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously
    terminated action in this court?                               Yes☐   No x

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A.  Federal Question Cases:
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts

2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent

6. ☐ Labor-Management Relations

7. X Civil Rights
8. ☐ Habeas Corpus

9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
     (Please specify)

B.  Diversity Jurisdiction Cases:
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
     (Please specify)

**ARBITRATION CERTIFICATION**                          AUG 23 2017

(Check appropriate Category)

I, Michael E. Gehring, Esquiure _____, counsel of record do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case _____ exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: _____**8-23-17**_____    _____    ____**57224**_____
                                     Attorney-at-Law              Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

---

**I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.**

DATE: _____**8-23-16**_____    _____    ____**57224**_____
                                     Attorney-at-Law              Attorney I.D.#

CIV. 609 (4/03)

**APPENDIX I**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA



## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Jack J., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | **17   3793** |
| | : | |
| Coatesville Area School District | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a)  Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.          ( )

(b)  Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits          ( )

(c)  Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d)  Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.          ( )

(e)  Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)          ( )

(f)  Standard Management – Cases that do not fall into any one of the other tracks.     ( x )

| | | |
|---|---|---|
|    8/23/17    |      |   Plaintiffs   |
| **Date** | **Attorney-at-law** | **Attorney for** |
| | Michael E. Gehring, Esquire | |
|  610-648-9300  |  610-648-0433  |  jhardy@mcandrewslaw.com  |
| **Telephone** | **FAX Number** | **E-Mail Address** |

AUG 23 2017

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACK J., through his Parent JENNIFER S., of of Downingtown, PA | : : : : | Civil Action |
| Plaintiffs | : : | |
| v. | : : | No. |
| COATESVILLE AREA SCHOOL DISTRICT 3030 C.G. Zinn Road Thorndale, PA 19372 | : : : : : | |
| Defendant | : | |

**COMPLAINT**

## I.   **Preliminary Statement**

1.     This action is brought by Jack J., a minor child with disabilities, and his parent Jennifer S. (collectively referred to as "Plaintiffs" or the "Family"), against Defendant Coatesville Area School District (the "District"), under the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. § 1400, et seq. and its federal and state implementing regulations; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C.A. § 794, and its federal and state implementing regulations; the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., and its federal and state implementing regulations; and Chapters 14 and 15 of the Pennsylvania Code.

2.     During the time period at issue from January 27, 2016 through May 8, 2017, the District failed to provide Jack with an appropriate program and placement, and Jack failed to make meaningful educational progress.  As a result, Jack's mother filed a Special Education Due Process complaint seeking an award of compensatory education, and an order that the District develop an appropriate program and placement going forward.  Following a 3-day evidentiary hearing, Due Process Hearing Officer William F. Culleton, Esquire, on May 25, 2017 issued a

decision denying relief to the Family.  This Decision is incorrect in major respects, and should be reversed by this Court, and appropriate relief awarded to Jack and the Family.

3.      This Court is required to undertake an independent review of the record and the decision of the Hearing Officer. Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206-07 (1982); Susan N. v. Wilson School Dist., 70 F.3d 751, 759 (3d Cir. 1995).  After fully considering the entire record, this Court should reverse the Hearing Officer's decision, and award appropriate relief to the Family for the District's educational failures.

## II.    Parties

4.      Jack was born in 2004, and, at all relevant times to this action, was an enrolled student in, and resident of, the District.  Jack is a student with disabilities as defined under IDEA, and a Protected Handicapped Student under Section 504 and the ADA.

5.      Jennifer S. is Jack's mother.  At all times relevant to this action, Jennifer S. lived with Jack in Downingtown, Pennsylvania and within the geographical boundaries of the District.

6.      The District is located at 3030 C.G. Zinn Road in Thorndale, Pennsylvania.  The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries; such services include those mandated under IDEA as well as Pennsylvania's statutory/regulatory scheme concerning young children with disabilities. 11 P.S. § 875-101; 22 Pa. Code §§ 14.131 - 14.133; see also, e.g., 24 P.S. Chapter 13; and 22 Pa. Code Chapters 14 and 15.

## III.   Jurisdiction and Venue

7.      This Court has original jurisdiction over this appeal pursuant  to 28 U.S.C. § 1331

2

because this case raises federal questions under the IDEA, Section 504, and the ADA.

8.     Plaintiffs have exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a Special Education Due Process hearing.

9.     Plaintiffs' claims and remedies are authorized by 20 U.S.C. § 1415, and 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

10.    All of the Defendant's actions complained of herein have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## IV.     Additional Facts Supporting Liability

11.    Jack is a thirteen-year-old soon-to-be 8th grade student who currently attends school in the District. At the time of Jack's initial enrollment in November of 2013 – when Jack was in 4th grade – the District was provided with records from Jack's previous school district, Oxford Area School District ("OASD"), which included, among other records, two recently completed Evaluation Reports ("ERs").

12.    The first OASD ER, dated August 29, 2013, found Jack IDEA-eligible for special education services under the classification of Other Health Impairment ("OHI") due to an Attention Deficit Hyperactivity Disorder ("ADHD") diagnosis and scores in the clinically significant range on the Connors-3 Teacher Rating Form in the areas of Hyperactivity/Impulsivity, Inattention, and Executive Functioning.[1] The second OASD ER, also dated August 29, 2013, but with an addendum dated September 18, 2013, without any new testing, record review, observation, or any other kind of assessment, concluded that Jack was not

---

[1]     The Connors-3 is a diagnostic assessment for ADHD and its most common comorbid problems and disorders in children and adolescents aged 6 to 18 years. It is a multi-informant assessment/rating scale that takes into account home, social, and school settings with ratings forms for parents, teachers, and the student.

3

eligible for special education services under the IDEA, and instead determined that Jack was eligible for a Service Agreement under Section 504.

13.     Upon receiving Jack's records from OASD, including the two 2013 ERs with inconsistent eligibility determinations, the District did not convene a meeting with Jack's parents to further consider Jack's eligibility, or initiate an evaluation of its own. Instead, the District merely adopted the OASD ER, which found Jack ineligible, and proceeded to implement a 504 Service Agreement that failed to meet Jack's needs.

14.     From November of 2013 through the end of that school year, Jack experienced significant struggles at school with attention, focus, behavior, and executive functioning skills. Jack also displayed similar struggles at home. His school bag was generally a disaster. Jack frequently forget to bring home his homework; or he brought a portion of the homework home, but not all of it; or he brought home the material, but did not know what to do with it.

15.     Toward the end of the 2013-2014 school year, Jack's mother, due to her continuing concerns over Jack's educational programming and the inadequacy of his Section 504 Service Agreement, requested that the District evaluate Jack to determine his eligibility for special education. In response to the parent's request, the District issued a Permission to Evaluate ("PTE") on April 7, 2014 to which his mother consented.

16.     The District proceeded with the evaluation and issued an ER on June 9, 2014. Cognitive testing revealed overall functioning solidly in the average range with a Full Scale Intelligence Quotient of 96 on the Wechsler Intelligence Scale for Children ("WISC-IV"). There was some variability within certain cognitive skill areas, with Jack scoring in the high average range within the Verbal Comprehension Index, the average range within the Perceptual Reasoning Index and the Working Memory Index, and the low average range within the

4

Processing Speed Index.

17.     Again, teacher behavior rating scales on the Connors-3 completed as part of the 2014 ER resulted in clinically significant or at-risk scores in the areas of Inattention; Hyperactivity; Executive Functioning,[2] Learning Problems, Defiance/Aggression, Restlessness; Emotional Liability, ADHD scales, and Oppositional Defiant Scales.  Despite the results of the assessments completed as part of its 2014 ER, the School District concluded that Jack did not have a disability and did not require special education.

18.     Jack's mother disagreed with the June 2014 ER, and obtained a district-funded independent educational evaluation by Dr. Kara Schmidt, a licensed and certified school psychologist and neuropsychologist.  Dr. Schmidt's evaluation of Jack was comprehensive and thorough; it assessed all areas of suspected need including cognition, verbal functioning, visuospatial functioning, attention and executive control, processing speed, memory, sensorimotor skills, academics, and behavioral, emotional and adaptive functioning skills.  Dr. Schmidt's evaluation procedures also included a thorough review of Jack's educational records, a school observation, and input from Jack's mother and teachers.

19.     The results of Dr. Schmidt's testing showed that although Jack continued to display cognitive abilities solidly in the average range, he exhibited weaknesses and delays with regard to working memory, sustained and divided attention, problem solving, inhibition, and executive control.  He also exhibited moderate-to-severe symptoms of distractibility, reduced

---

[2] Executive functioning skills include "organizing, directing, managing, planning, sustaining effort to task completion and learning from experience."  See Nicolas H. v. Norristown Area School Dist., 2017 WL 569519 at *2 (E.D. Pa. Feb. 13, 2017).  See also https://en.wikipedia.org/wiki/Executive _functions ("Executive functions (collectively referred to as executive function and cognitive control) are a set of cognitive processes – including attentional control, inhibitory control, working memory, and cognitive flexibility, as well as reasoning, problem solving, and planning – that are necessary for the cognitive control of behavior: selecting and successfully monitoring behaviors that facilitate the attainment of chosen goals.").

concentration, impulsivity, disorganization, and reduced stamina. While Jack's reading comprehension skills appeared age- and grade-appropriate, he displayed high variability within comprehension tasks due to inattention and a lack of self-monitoring. In the area of math, Jack's fluency skills were well below age and grade expectation. His inattention and executive functioning weaknesses also had a severe impact on Jack's written language skills including his sentence structure, application of writing mechanics, and essay construction skills. Behavioral concerns in the home and school setting included impulsivity, restlessness/hyperactivity, lack of initiation, disorganization, inattention, reduced self-monitoring, negative mood, and misconduct.

20.    Dr. Schmidt ultimately concluded that Jack met the criteria for ADHD and should be identified as IDEA-eligible for special education services under the classification of OHI, and made a variety of reasonable recommendations for Specially Designed Instruction ("SDI"), accommodations and supports that Jack required in order to make meaningful educational progress in school, including, among others, a program and placement that allows for a low student-to-teacher ratio, hands-on/multisensory teaching, individualized one-to-one instruction, close teacher monitoring and mentoring, the completion of a Functional Behavioral Assessment ("FBA") and development of a Positive Behavior Support Plan ("PBSP"), and specialized direct instruction in executive functioning skills, including study skills and general learning and memory strategies, all while also providing Jack with a challenging curriculum that meets his average to high average abilities levels.

21.    On May 4, 2015, following it's receipt of the independent evaluation by Dr. Schmidt, the District issued a Prior Written Notice ("PWN") for an Initial Evaluation, to which the parent consented. On June 4, 2015, the School District issued a revised ER, which included a brief review and summary of Jack's previous testing, including the evaluation by Dr. Schmidt,

6

a review of his current classroom performance and a classroom observation.   The District

ultimately accepted Dr. Schmidt's conclusions and identified Jack as eligible for special

education services under the IDEA with the classification of OHI.

22.     Despite Jack's identification under the IDEA, the District failed to timely develop

an Individualized Education Program ("IEP").   As a result, Jack's parents ultimately obtained

legal counsel, and filed for a Due Process Hearing challenging the District's failure to timely

identify and offer an appropriate IEP, ultimately resulting in a settlement of compensatory

education claims through January 27, 2016.

23.     For the first time, a final IEP and Notice of Recommended Educational Placement

("NOREP") was offered by the District to Jack's mother on or about January 15, 2016.   The

January 2016 IEP included three goals: (1) a writing goal requiring Jack to obtain a certain score

on the Pennsylvania Writing Rubric; (2) a math fluency goal requiring the completion of mixed

operation problems within a five minute period, and (3) a vague behavior goal requiring Jack to

remain focused on a task.   None of the goals in the IEP included any baseline data indicating

Jack's performance level on the goal at the time it was drafted.   The IEP included no goals

related to study skills, organization, or self-regulation.   The IEP did not include any assistive

technology or assistive technology evaluation, or provide for an FBA or PBSP as recommended

in the independent evaluation by Dr. Schmidt. The IEP included a handful of accommodations in

the SDI section, but did not include a majority of the recommendations made by Dr. Schmidt in

her report, including the provision of direct instruction in executive functioning and study skills.

The IEP did not include any Related Services, other than an Occupational Therapy ("OT")

evaluation, and determined that Jack was not eligible for Extended School Year ("ESY")

services.

24.     The January 2016 IEP recommended an itinerant level of support, where Jack spent approximately 95% of his day in regular education.  The January IEP anticipated that Jack would participate in a brief check-in and check-out procedure with his learning support teacher in the morning and afternoon for a total of 3 to 5 minutes.  Jack was also to be pulled from the classroom on a daily basis during language arts to receive direct replacement instruction on the goals in his IEP in a special education classroom.

25.     Jack's mother did not approve the January 2016 IEP, and requested some revisions.  On February 10, 2016, the District issued a revised IEP, which included a revised behavioral goal and a new organizational goal related to the timely completion of homework and organization of school materials.  In all other respects, the February 2016 revised IEP was practically identical to the January 2016 IEP.

26.     Jack's mother received the revised IEP and NOREP via email and in Jack's backpack.  The Parent signed the NOREP and returned it to the District around the time she received it.  The District claims that it never received the signed NOREP from Jack's mother at that time, and as a result, the IEP was not implemented.

27.     In January of 2016, the District also issued another PWN for an Initial Evaluation seeking to conduct an OT evaluation, as recommend by Dr. Schmidt in her April 2015 evaluation, nearly a year earlier.  Jack's mother provided the District with consent for the OT evaluation, and the team reconvened on April 20, 2016 for another IEP meeting.

28.     At the April 20, 2016 meeting, Jack's IEP was revised to include the provision of direct OT services, two OT goals, and three new SDIs related to Jack's OT needs.  In all other respects the April 2016 IEP was practically identical to the February 2016 IEP.  Jack's mother also raised concerns regarding Jack's program, and asked that he receive more time in the

8

learning support classroom to receive direct, explicit instruction in his areas of need, including executive functioning skills. Jack's mother was informed by staff that the District no longer offered the level of support the parent was requesting. Again, the parent signed and returned the NOREP approving the IEP, and the District began to implement only portions of the IEP shortly thereafter.

29.     Although Jack's IEP called for him to be pulled from Language Arts to receive Direct Instruction[3] on his goals in a special education classroom, Jack never received this support as there was no learning support classroom for him to attend.

30.     Following the development and implementation of the April 2016 IEP, Jack continued to experience significant difficulties with attention, focus, behavior, and executive functioning skills in school and made minimal progress on his goals in the IEP. During the 2016-2017 school year, Jack's daily check-in and check-out procedures were inconsistently followed, and oftentimes the teacher was not available for check-in. By the end second marking period of that school year, Jack stopped showing up for check-in and check-out on any kind of regular basis. Although Jack spent 20 to 30 minutes per day with his special education teacher, much of that time was spent progress monitoring and assisting Jack with his homework due to his poor completion rate, resulting in minimal to no instruction on any of his goals in the IEP. Additionally, Jack no longer received push-in support from his special education teacher during

---

[3] Direct Instruction is an approach to teaching that is skills-oriented, and the teaching practices it implies are teacher-directed. It emphasizes the use of small-group, face-to-face instruction by teachers using carefully articulated lessons in which cognitive skills are broken down into small units, sequenced deliberately, and taught explicitly. It was also called systematic teaching, or explicit teaching, or active teaching. http://www.education.com/ reference/article /what-direct-instruction/. In Direct Instruction, 1) students are placed in instruction at their skill level; 2) the program's structure is designed to ensure mastery of the content; 3) instruction is modified to accommodate each student's rate of learning; and 4) programs are field tested and revised before publication. https://www.nifdi.org/what-is-di/basic -philosophy.

9

the 2016-2017 school year.

31.     Progress monitoring data collected by the District during the second half of the 2015-2016 school year and the 2016-2017 school show Jack's performance on the written expression goal to be inconsistent at best, and in certain areas of written expression, the data revealed regression.

32.     The data sheets used to progress monitor on Jack's behavior goal were not consistently submitted, and submitted forms were at times incomplete.  By the second marking period, the District concluded that Jack was not making progress on his behavioral goal, but took no steps to revise Jack's IEP or complete an FBA and develop a PBSP.

33.     The District failed to appropriately collect data on Jack's organizational goal. Instead of collecting data on Jack's ability to timely complete homework and organize his school materials, the District's progress monitoring was limited to Jack's rate of homework completion without considering whether the homework was completed in a timely manner.  The data that the District did collect, however, revealed no progress in homework completion in some classes, while revealing regression in others.  At times, Jack's homework completion was as low as 50%.

34.     In light of Jack's continuing educational struggles and lack of meaningful progress, Jack's mother filed a Special Education Due Process Hearing complaint on November 18, 2016.  A special education due process hearing was held over three days between February and May of 2017.  Hearing Officer William Culleton, Esquire issued his decision on May 25, 2017 finding in favor of the District and denying the Parents' request for compensatory education and the development of an appropriate program going forward.

## V.     Statutory Authority

35.     The purpose of the IDEA is to ensure that "all children with disabilities have

10

available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). IDEA and the regulations thereunder, 34 C.F.R. § 300.100 et seq., and 22 Pa. Code Chapter 14, require that public school districts provide disabled children with a Free Appropriate Public Education ("FAPE"), as well as extensive due process procedures to effectuate that right

36.     After a child is determined to be eligible, the IDEA statute and regulations provide for periodic re-evaluations, which "may occur not more than once a year unless the parent and public agency agree otherwise; and must occur at least once every 3 years, unless the parent and the public agency agree that an evaluation is unnecessary." 20 U.S.C. §1414(a)(2)(B)(i), (ii); 34 C.F.R. § 300.303(b). School districts, however, also have the obligation to "ensure that a reevaluation of each child with a disability is conducted" at any time "the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or if the child's parent or teacher requests a reevaluation." 20 U.S.C. §1414(a)(2)(A)(i), (ii); 34 C.F.R. 300.303(a).

37.     Under the IDEA, an "appropriate education" is a series of services described in an IEP that is reasonably calculated to afford meaningful educational progress in the Least Restrictive Environment ("LRE"). Oberti v. Board of Educ. of Borough of Clementon School Dist., 995 F.2d 1204, 1214-15 (3d Cir. 1993). The fundamental purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C.

§ 1400 (d)(1)(A). IDEA and the regulations thereunder, 34 C.F.R.§ 300.100 et seq., require that public school districts provide disabled children with a FAPE, which includes the LRE requirement. 34 C.F.R. §§ 300.17, 300.114-117, 300.320 (various subsections related to LRE).

38.     In addition to LRE principles, the IDEA provides that an IEP team, which includes both school officials and the child's parents, must develop an appropriate educational program and placement for each eligible child through an IEP. A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the District complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive *meaningful* educational benefit. Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206-7 (1982); Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004); Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999); Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 184 (3d Cir. 1988); Lauren W. v. DeFlaminis, 2005 WL 1353643 at *6 (E.D. Pa. June 1, 2005). The United States Supreme Court in Rowley emphasized the importance of adherence to both the substantive *and* procedural requirements of IEP development: "When the elaborate and highly specific procedural safeguards embodied in Section 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to the procedural safeguards cannot be gainsaid." Rowley, 458 U.S. at 206-07. See also Muth v. Central Bucks County School Dist., 839 F.2d 113 (1998) (ordering reimbursement for delayed IEP).

39.     The IEP is the cornerstone of the special education program for a student. Honig v. Doe, 484 U.S. 305, 311 (1988); Ridgewood, 172 F.3d at 247; W.B. v. Matula, 67 F.3d 484,

492 (3d Cir. (1995), abrogated on other grounds, A.W. v. Jersey City Public Schools, 486 F.3d 791 (3rd Cir. 2007); Polk, 853 F.2d at 173. The IDEA requires that every IEP include a statement of the child's present levels of academic achievement and functional performance; a statement of measurable annual Goals; a description of how the child's progress toward meeting the annual Goals will be measured and when periodic reports on the progress the child is making toward meeting the annual Goals will be made; a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child; a statement of the program modifications or supports for school personnel that will be provided to enable the child to advance appropriately toward attaining the annual Goals, to be involved in and make progress in the general education curriculum; and an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in activities. 20 U.S.C. §1414(d); 34 C.F.R. § 300.320.

40. It is the School District's non-delegable obligation to create an appropriate IEP. Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004), Carlisle Area School Dist. v. Scott P., 62 F.3d 520, 533 (3d Cir. 1995); Furhmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1035 (3d Cir. 1993). Even a parent's failure to participate in a meaningful manner in the IEP process will not excuse an inappropriate IEP. Warren G. v. Cumberland Valley School Dist., 190 F.3d 80 (3d Cir. 1999); Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78 (3d Cir. 1996).

41. The Supreme Court has determined the IEP to be the "primary vehicle" and the "centerpiece of the statute's education delivery system for disabled children," and to embody the substantive standard for school districts' obligation to provide FAPE to children with disabilities.

13

Honig v. Doe, 484 U.S. 305, 311 (1988). Therefore, when an eligible child with a disability is denied an appropriate IEP and the special education and Related Services described and promised therein, the child is denied FAPE.

42.     The Third Circuit Court of Appeals has also clarified that under the IDEA, a child with a disability is entitled to a program that is reasonably calculated to confer *meaningful* educational benefit. D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 556 (3d Cir. 2010) (a school district "must confer an education providing 'significant learning' and 'meaningful benefit' to the child"); Polk, 853 F.2d at 184; Oberti v. Board of Educ. of Borough of Clementon School Dist., 995 F.2d 1204, 1213 (3d Cir. 1993); Ridgewood, 172 F.3d at 247.  In order to provide meaningful benefit, a child's IEP must include academic and functional Goals designed to meet the child's educational needs that result from the child's disability.  34 C.F.R. § 300.320(a)(2)(i).

43.     The United States Supreme Court in its recent decision in Endrew F. v. Douglas County School District RE-1, 137 S. Ct. 988 (March 22, 2017), emphasized that IDEA requires more than a program reasonably calculated to allow a student to make "*some* progress."  Id. at 997, 1000-01(emphasis added).  Instead, IDEA "requires an educational program reasonably calculated to enable a child to make progress *appropriate in light of the child's circumstances*." Id. at 999 (emphasis added).  This clearly requires that a child's progress must be assessed with consideration of the child's educational *potential*, see Polk, 853 F.2d at 182;  Endrew F., 137 S. Ct. at 999, and that an "educational program must be appropriately ambitious in light of his circumstances," as minimal "progress from year to year can hardly be said to have been offered an education at all."  Id. at 1000-01 (emphasis added).  The progress standard set forth in Endrew F. is therefore entirely consonant with the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably designed to allow a

student to make *meaningful* educational progress and achieve "significant learning." Brandywine Heights Area School Dist. v. B.M., No. 14-06624, slip op. at 13 n.20 (E.D. Pa. March 29, 2017) (citing L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir. 2006)).

44.     It is abundantly well-settled that "education" extends beyond discrete academic skills, and includes the social, emotional, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. M.C. v. Central Regional School Dist., 81 F.3d 389, 393-394 (3d Cir. 1996); Polk, 853 F.2d at 181-182; Kruelle v. New Castle County School Dist., 642 F.2d 687, 693 (3d Cir. 1981); Armstrong v. Kline, 629 F.2d 269 (3d Cir. 1980); Bucks County Public Schools v. Department of Educ., 529 A.2d 1201 (Pa. Cmwlth. 1987); Big Beaver Falls Area Sch. Dist. v. Jackson, 615 A.2d 910 (Pa. Cmwlth. 1992). Therefore, for an IEP to be appropriate, it must offer a child the opportunity to make progress that is "meaningful" in all relevant domains under IDEA, including behavioral, social, and emotional. M.C., 81 F.3d at 394; Ridgewood, 172 F.3d at 247.

45.     Pursuant to the above standards, the District unquestionably failed in its responsibilities to Jack and an award of compensatory education is warranted for the time period at issue, and the Hearing Officer erred in concluding to the contrary.

46.     The Hearing Officer erred in finding that the District offered Jack a FAPE from January 27, 2016 through May 8, 2017 (the final hearing date). The District during this period failed to provide Jack with an appropriate program and placement designed to confer either significant learning or meaningful benefit. The IEPs in question included inadequate and/or inappropriate SDI, insufficient Related Services, no meaningful supports for school personnel, and an inappropriate placement. The IEPs also lacked a PBSP based on an FBA, as specifically

15

provided in Dr. Schmidt's independent evaluation; indeed, no FBA was ever performed. The IEPs also failed to provide Jack with assistive technology, or even an assistive technology evaluation. Most importantly, the IEPs failed to provide Jack with a program that allowed him to make meaningful educational progress. Indeed, the Hearing Officer applied an outmoded, incorrect legal standard in concluding that Jack made appropriate educational progress by finding that he made "progress" or "some progress" toward his IEP goals, rather than the "meaningful" progress required by prevailing Third Circuit law and Endrew F.

47.     There is no provision in any of the IEPs for Direct Instruction in study skills or organizational/executive functioning skills as recommended. Jack's special education teachers claimed that they instructed him in executive functioning/learning related behaviors when issues arose, but it was clear that there was no systematic, planned instruction in those areas of deficit.

48.     None of the IEPs included goals related to study skills, or self-regulation, and there were no baselines for any of the goals in any of the IEPs. Although the IEPs included an organization skills goal and a task completion/focus goal, neither was appropriately implemented or progress monitored. The testimony and evidence presented at the hearing also demonstrates that no one was actually instructing Jack on the organizational /time management goals. All of Jack's regular education teachers testified that they had no involvement in the implementation of the goals. The special educations teachers were not with Jack long enough to actually instruct him on those goals. They were either pushing into content specific classes (i.e., math) to help Jack with the content in those classes, or were pulling him from other classes for short periods of time to monitor Jack's progress on certain goals or help him complete missing assignments.

49.     Significantly, Jack's IEPs included a placement – a learning support classroom – that the District did not even have.

50.     The District's placement for Jack as set forth in the District's IEPs provided either an itinerant level of learning support in the regular education setting *or*, as needed, in a learning support classroom environment.  The IEPs therefore reflected, and guaranteed, Jack a learning support classroom when he needed such a classroom to make meaningful educational progress.

51.     However, such a classroom did not even *exist* in the District; as such, the IEPs identified necessary supports for Jack that the District could not possibly provide.

52.     When Jack's mother asked the District for more direct support by way of Jack having more time with a learning support teacher to address some of his deficits, she was told that this level of support was not available in the District, i.e., that Coatesville is an "all inclusion" district with no learning support classrooms, which is itself a violation of IDEA's requirement that a full continuum of placements be available.  Although at the hearing Jack's teachers tried to distance themselves from this statement, they ultimately admitted that – directly contrary to Jack's IEPs – *no learning support classes were available at the middle or high school level*.

53.     Thus, the District's IEPs provided that Jack would receive a specific placement, instruction in a learning support classroom, as his needs required, that it could not possibly provide, because such classrooms did not exist in the District.  While the Hearing Officer's Decision found the District's placement description "ambiguous" and stated that he did not "condone" such actions, it is clear that the District's description of Jack's placement was not merely "ambiguous"; the District knowingly specified that Jack would be placed in a learning support classroom environment when the District knew that such a classroom did not exist.

54.     In addition to the District's IEPs being inappropriate as written, the District also failed to implement them with fidelity.

17

55.     The Hearing Officer specifically found that there were "flaws in the implementation" of the IEPs, and that this "deviation from the requirements of the IEP[,]" including the District's failure to provide Jack with small group instruction in a non-existent learning support environment, was "inappropriate."

56.     Indeed, as the Hearing Officer noted, Jack's teachers at the hearing *admitted* to not following Jack's IEPs, including based on a teacher's own view that an IEP provision was "unnecessary." As noted, the testimony and evidence from the hearing also demonstrates that no one actually instructed Jack on the organizational /time management goals in his IEPs.

57.     These deficits in the District's IEPs, and the failure to implement them properly, led to Jack's failing to make meaningful educational progress on his IEP goals, and the Hearing Officer erred in concluding otherwise.

58.     The Hearing Officer applied an incorrect legal standard in assessing whether Jack made appropriate progress toward his IEP goals. The Hearing Officer found: "Student also made some progress on IEP goals. Progress monitoring data was mixed, but they showed progress on a number of goals." However, under Endrew F. and as long held in this Circuit, merely making "some progress" or "progress" is insufficient, as an IEP must be designed to allow a student to make "meaningful" progress. D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 556 (3d Cir. 2010) (a school district "must confer an education providing 'significant learning' and 'meaningful benefit' to the child"); Oberti v. Board of Educ. of Borough of Clementon School Dist., 995 F.2d 1204, 1213 (3d Cir. 1993) (an "appropriate education" is a series of services described in an IEP that is reasonably calculated to afford meaningful educational progress). Indeed, the Supreme Court in the recent Endrew F. decision clearly rejected the 10th Circuit's holding that a student's making "some progress" is sufficient to confer a FAPE.

18

Endrew F. v. Douglas County School District RE-1, 137 S. Ct. 988, 997, 1000-01 (2017) (IDEA requires more than a program reasonably calculated to allow a student to make "*some* progress") (emphasis added). Yet, the Hearing Officer explicitly, and erroneously, repeatedly applied the "progress" or "some progress" standard to assess Jack's progress toward his IEP goals. This was clear error. Under the correct "meaningful educational progress" standard, it is manifest that Jack did not make appropriate progress toward his IEP goals.

59.     On their face, certain of Jack's progress reports objectively showed that Jack failed to make appropriate progress toward his IEP goals. In other areas, the District failed to effectively monitor Jack's progress at all as required by 34 C.F.R. § 300.320(a)(3)(i).

60.     Progress monitoring data collected by the District during the second half of the 2015-2016 school year and the 2016-2017 school show Jack's performance on the written expression goal to be inconsistent at best, and in certain areas of written expression, the data revealed regression.

61.     The data sheets used to monitor progress on Jack's behavior goal were not consistently submitted, and the submitted forms were at times incomplete. By the second marking period, the District concluded that Jack was not making progress on his behavioral goal, but took no steps to revise Jack's IEP or complete a FBA and develop a PBSP.

62.     The District failed to appropriately collect data on Jack's organizational goal. The data that the District did collect, however, revealed no progress in homework completion in some classes, while revealing regression in others. At times, Jack's homework completion was as low as 50%.

63.     Moreover, the Hearing Officer's statement that the testimony of Jack's teachers "corroborated" that Jack made appropriate progress is contradicted by the record. The testimony

19

of his special and regular education teachers showed that Jack has difficulty in school with respect to academics – in particular with regard to his attention and focus, initiating and completing tasks, self-regulating and inhibition of behaviors, organizational skills, planning, study skills, and homework.   Every teacher who testified at the due process hearing acknowledged those skills as areas of need for Jack in their testimony and in emails.  Some teachers even reported that Jack's functioning in those areas got *worse* as the year went on.

64.   The Hearing Officer excused Jack's lack of progress by pointing to Jack's grades. However, case law is clear that the mere ability of a student to maintain satisfactory grades does not establish that a District has provided a student with a FAPE, particularly where other significant areas of need, including in the areas of attention, executive functioning, and behavior, are improperly addressed.  See Endrew F., 137 S. Ct. at 1000 n.2 ("we do not hold today, that 'every handicapped child who is advancing from grade to grade ... is automatically receiving a [FAPE].'") (quoting Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 203, n. 25 (1982)). See also Lauren P. v. Wissahickon School Dist., 310 Fed. Appx. 552, 554-55 (3d Cir. 2009) (defendant's "failure to address [the child's] behavioral problems in a systematic and consistent way denied [her] a FAPE."); G.D. v. Wissahickon School Dist., 832 F.Supp.2d 455, 466 (E.D. Pa. 2011) ("the District had an obligation to look beyond simply Jack's cognitive potential or academic progress and to address the attentional issues and behaviors that [student's teacher] had identified as impeding his progress").

65.   In light of the Hearing Officer's over reliance on report card grades, he did not give sufficient consideration to the District's failure to timely and appropriately address Jack's needs in executive functioning, study skills, and social skills, and Jack's lack of meaningful educational progress in those areas.

66.     As a result of the above, Jack failed to make meaningful progress in his program, and has been denied FAPE. When a School District fails to provide FAPE, it is well-settled that compensatory education is an available remedy for the student under the IDEA or Section 504. Lester H. v. Gilhool, 916 F.2d 865, 868-69 (3d Cir. 1990); Ridgewood, 172 F.3d at 250 n.11; M.C., 81 F.3d at 397. Compensatory education is designed to provide eligible students with the benefit of the services they should have received pursuant to a FAPE. Lester H., 916 F.2d at 873 (award of compensatory education merely compensated the student for an inappropriate placement, belatedly allowing student to receive the remainder of his FAPE). The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the school district to rectify the problem. M.C., 81 F.3d at 397. See also G.L. v. Ligonier Valley School Auth., 802 F.3d 601, 625 (3d Cir. 2015) (a child deprived of a FAPE is entitled to award of compensatory education designed to allow child to "be made whole with nothing less than a 'complete' remedy."). Thus, compensatory education is an in-kind remedy intended to provide educational services denied to a child by a school district's failure to provide a FAPE. Lester H., 916 F.2d at 873. The Third Circuit has recently found that an appropriate remedy for a failure to provide FAPE is "the establishment of a fund to be spent on the child's education." D.F. v. Collingswood Borough Bd. of Educ., 694 F.3d 488, 498 (3d Cir. 2012).

67.     In the present matter, for the reasons discussed above, the District failed to meet Jack's needs and thereby, deprived Jack of FAPE. Accordingly, he is entitled to compensatory education for the time period at issue, and the Hearing Officer erred in ruling otherwise.

68.     Because the District violated IDEA by failing to offer Jack appropriate IEPs, it also violated Section 504, and the Hearing Officer erred in denying relief under Section 504.

21

69.     Under Section 504, recipients of federal funds such as the District are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).  The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

70.     Section 504 prohibits the exclusion of, or discrimination against, handicapped persons in federally funded programs such as public education.  Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services.  29 U.S.C. § 794; 34 C.F.R. § 104.1 et seq. Failure to provide accommodations, supplemental services and FAPE constitutes unlawful discrimination for purposes of Section 504.

71.     Under Section 504, a "handicapped person" is defined as "any person who has a physical or mental impairment which substantially limits one or more major life activities." 34 C.F.R. § 104.3.  The term "physical or mental impairment" is defined as "any physical or psychological disorder such as . . . emotional or mental illness and specific learning disabilities" Id.  The term "major life activities" is defined as "functions such as caring for one's self . . . learning, and working." Id.

72.     Section 504 provides specific requirements for public school systems to protect all handicapped students, even those who may not qualify under the categorical listings of IDEA. Section 504 requires that "a public elementary or secondary education program shall annually

22

undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. § 104.32; Ridgewood, 172 F.3d at 253; W.B. Matula, 67 F.3d 484, 492 (3d Cir 1995), abrogated on other grounds, A.W. v. Jersey City Public Schools, 486 F. 3d 791 (3d Cir. 2007). The District must identify all children who are suspected of having a disability, and must also ensure that its evaluations to determine actual eligibility for services occur within a reasonable time after school officials are notified of a child who is likely to have a disability. Id. at 501.

73. "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007).

74. Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. James S. v. School Dist. of Phila., 559 F. Supp.2d 600, 620 (E.D. Pa. 2008) (citing Molly L. v. Lower Merion School Dist., 194 F. Supp.2d 422, 426 (E.D. Pa. 2002)). Section 504 "is broader in scope [than [IDEA].... The definition of 'individual with a disability' under § 504 of the Rehabilitation Act is broader in certain respects than the definition of a 'child with [a] disabilit[y]' under the IDEA." Muller v. Commission on Special Educ. of E. Islip Union Free School Dist., 145 F.3d 95, 100 n.2 (2d Cir.1998). A school may violate Section 504 independent of any violations of IDEA. Lauren G. v. West Chester Area School Dist.,906 F.Supp.2d 375 (E.D. Pa. 2012) (granting

23

tuition reimbursement for school district's failure to provide FAPE under Section 504 during period of time for which no relief was granted under IDEA).

75.     Under Section 504, placement procedures require a school to interpret "evaluation data and in making placement decisions, a recipient shall (1) draw upon information from a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior, (2) establish procedures to ensure that information obtained from all such sources is documented and carefully considered, (3) ensure that the placement decision is made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options, and (4) ensure that the placement decision is made in conformity with 104.34." 34 C.F.R. § 104.35 (c).

76.     In order to establish a violation of Section 504, a plaintiff must prove that: (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. Ridgewood,172 F.3d at 253; Andrew M., 490 F.3d at 350.

77.     Jack is a student who, at all times relevant to this Complaint, is and was disabled, and is and was otherwise qualified to participate in, and receive equal benefits from, the Defendant's educational programs with appropriate instruction, accommodations and supplemental supports for purposes of Section 504.

78.     Defendant's failure to offer Jack a non-discriminatory, appropriate educational program and placement resulted in his being excluded from participation in, denied the benefits of, or subject to discrimination at, his educational program.

24

79.     Defendant is the recipient of federal financial assistance.

80.     The Hearing Officer erred in not awarding relief under Section 504.    The evidence established that the District violated Section 504 by failing to offer Jack an appropriate program and placement in the time period at issue.

81.     Because the District violated Section 504, it also violated the ADA.  The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)."  Jeremy H. v. Mount Lebanon School Dist, 95 F.3d 272, 279 (3d Cir. 1996).  That court held that "the remedies, procedures, and rights" applicable to Section 504 claims are the same as those under the ADA. Id.; see also Tereance D. v. School Dist. of Philadelphia, 548 F. Supp.2d 162, 169-70 (E. D. Pa. 2008) (applying same analysis to claims under ADA as to claims under Section 504); Indiana Area School Dist. v. H.H., 428 F. Supp.2d 361, 363 n.3 (W. D. Pa. 2006) ("[T]he Third Circuit generally has held that the same analysis under § 504 applies in determining whether a defendant's actions violate the ADA.")

82.     Jack is a qualified individual with a disability for purposes of the ADA. As set forth above, the District excluded Jack from participation in, and denied him the benefits of the services, programs or activities of, a public entity.  The District's proposed IEPs failed to ensure that Jack was provided with appropriate educational and related services, accommodations and supplemental services which he required in order to have access to the District's programs and services and to make appropriate developmental and educational progress equal to that provided

25

to children without disabilities in violation of the ADA.

83.    The IDEA provides that an aggrieved party has the right to bring a civil action in federal district court, which conducts an independent review of the administrative record and any additional evidence presented by the parties. Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004), Susan N. v. Wilson School Dist., 70 F.3d 751, 756-757 (3d Cir. 1995); Delaware County Intermediate Unit v. Martin K., 831 F. Supp. 1206, 1220 (E.D. Pa. 1993). See also 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516(c)(3).

84.    Moreover, Section 504, IDEA, and the ADA all permit recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 42 U.S.C. § 12205; 20 U.S.C. 1415 § 615 (i)(3)(B); 34 C.F.R. § 300.517; 29 U.S.C. § 794a; Andrew M. v. Delaware County Office of Mental Health/Mental Retardation, 2005 WL 783070 at *15 (E.D. Pa. 2005) (attorneys' fees are recoverable under Section 504); Daniel S. v. Scranton School Dist., 230 F.3d 90, 95 (3d Cir. 2000) (attorneys' fees are recoverable under IDEA); Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311 (3d Cir. 2006) (attorneys' fees are recoverable under the ADA). Section 504 and the ADA additionally permit more expansive costs, including expert witness fees. L.T. v. Mansfield Twp. School Dist., 2009 WL 248818139 at *2 (D.N.J. Aug. 11, 2009) ("plaintiffs are entitled to reimbursement of their expert fees for their prevailing party status on their Rehabilitation Act claim"); M.M. v. School Dist. of Philadelphia, 142 F.Supp.3d 396, 413 (E.D. Pa. Nov. 3, 2015) ("Plaintiffs are entitled to recover expert fees under Section 504 and/or the ADA").

85.    Plaintiffs expect to prevail in the present proceeding, thereby entitling Plaintiffs to an award of statutory attorneys' fees.

86.    The IDEA clearly requires an independent review of the administrative decision

and permits a court to grant the relief sought by Plaintiffs, since the statute expressly endows courts with broad authority to grant "such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(A); 34 C.F.R. § 300.516(c)(3).  The IDEA further provides that federal courts hearing such matters "shall hear additional evidence at the request of a party."  20 U.S.C. § 1415(i)(2)(C)(ii).

WHEREFORE,  the Plaintiffs respectfully request that this Court:

1.     Assume jurisdiction over this action;

2.     Hear additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3.     Reverse the Hearing Officer's Decision to the extent it fails to Order the District to provide compensatory education as requested;

4.     Order the District to pay appropriate compensatory education from January 27, 2016 through May 8, 2017;

5.     Order the District to develop an appropriate program and placement for Jack;

6.     Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs;

7.     Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, ADA; and Pennsylvania law; and

8.    Grant such other relief as this Court deems proper.

Respectfully submitted,

Dennis C. McAndrews, Esquire
ID No. 28012

Michael J.  Connolly, Esquire
ID No.  82065

Michael E. Gehring, Esquire
ID No.  57224

McANDREWS LAW OFFICES
30 Cassatt Avenue
Berwyn, PA
(610) 648-9300 (phone)
(610) 648-0433 (fax)
Attorneys for Plaintiffs

28