**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| JACK J., through his<br>Parent JENNIFER S.,<br><br><br><br>v.<br><br><br>COATESVILLE AREA<br>SCHOOL DISTRICT | CIVIL ACTION<br><br><br>NO. 17-cv-3793 |
|---|---|

**MEMORANDUM RE: CROSS-MOTIONS FOR JUDGMENT ON THE**
**ADMINISTRATIVE RECORD**

**Baylson, J.**                                                     **July 12, 2018**

## I.        INTRODUCTION

This case arises from claims brought by Jack J. ("Jack"), through his Parent Jennifer S.

("Parent"), against Coatesville Area School District ("District") under the following Federal and

State statutes: The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et.*

*seq.*; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; the

Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et. seq.*; and Chapters 14

and 15 of the Pennsylvania Code.  Parent seeks a compensatory education for the period of

January 27, 2016 through May 8, 2017, and an order that the District provide Student with

appropriate educational services in the future.

After a Pennsylvania Special Education Hearing Officer denied Parent's request for relief

at a Due Process Hearing, Parent filed an appeal with this Court.  Presently before the Court are

cross-motions for Judgement on the Administrative Record.  After reviewing the record and

giving due weight to the findings of the Hearing Officer, this Court will affirm the administrative

decision, grant the District's motion, and deny Parent's motion.

## II.     PROCEDURAL HISTORY

On November 18, 2016, Parent filed a Special Education Due Process Complaint alleging that the District violated the IDEA and Section 504 by failing to provide Jack a free appropriate public education.  A Pennsylvania Special Education Hearing Officer conducted a Due Process Hearing and issued a decision in favor of the District.  Parent filed a complaint with this Court on August 23, 2017, appealing the Hearing Officer's decision (ECF 1).  The District filed an Answer to the Complaint and asserted affirmative defenses on October 25, 2017 (ECF 3).  Parent filed a Motion for Judgment on the Administrative Record on February 28, 2018 (ECF 7), the District cross-filed a Motion for Judgment on the Administrative Record on April 5, 2018 (ECF 9) and Parent replied on May 7, 2018 (ECF 11).

## III.     JURISDICTION

Parent now exercises a statutorily authorized appeal of the Hearing Officer's decision. This court asserts jurisdiction under 20 U.S.C. § 1415(i)(3)(A).

## IV.     THE IDEA FRAMEWORK

Congress enacted the IDEA as a framework for providing federal funding to state special education programs.  20 U.S.C. § 1411; Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 755-56 (3d Cir. 1995).  To be eligible for federal funding, states must provide a "free and appropriate education ("FAPE")…to all children with disabilities residing in the State."  20 U.S.C. § 1412(a)(1)(A).  "A [FAPE] consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction."  Susan N., 70 F.3d at 756 (citing Bd. of Educ. v. Rowley, 458 U.S. 176 (1982)).

The "primary mechanism" for delivering a FAPE is through an Individualized Education Program ("IEP") comprised of "a specific statement of a student's present abilities, goals for improvement, services designed to meet those goals, and a timetable for reaching the goals." 20 U.S.C. § 1414(b); Susan N., 70 F.3d at 756; D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010). Each IEP must be created by an "IEP team" composed of the eligible child's parents and various specialized educators. 20 U.S.C. § 1414(d)(4).

Though "the core of the IDEA is the collaborative process" established between parents and schools through the creation and implementation of a child's IEP, the act sets forth adjudicative procedures for parents who "believe that an IEP fails to provide their child with a FAPE." Ridley Sch. Dist. v. M.R., 680 F.3d 260, 269 (3d Cir. 2012). The IDEA entitles parents to file a Due Process complaint and receive an "impartial due process hearing" conducted by the State or local educational agency. 20 U.S.C. § 1415(f)(1)(A). A party "aggrieved by the findings and decision rendered" during the due process hearing may appeal by filing a civil action in state or federal court, without regard to the amount in controversy. 20 U.S.C. § 1415(i).

## V.     HEARING OFFICER'S DECISION

In response to the filing of Parent's Due Process complaint, a Pennsylvania Special Education Hearing Officer conducted a three-part hearing with sessions occurring on February 6, 2017, April 24, 2017, and May 8, 2017. (Administrative Hearing Transcript "AHT" at 2-350).

The Hearing Officer found the District's witnesses credible but accorded reduced weight to the testimony of Jack's mother, particularly regarding her "depiction of [Jack's] difficulties in the school setting." (Hearing Officer Report "H.O. Rpt." at 11-12.) The Hearing Officer noted that "Parent's testimony reveals a significantly inaccurate understanding of the services available to Student at school and how they were implemented." (H.O. Rpt. at 12.)

On May 25, 2017, the Hearing Officer issued a decision in favor of the District, concluding that the District "offered and provided a FAPE to [Jack] at all relevant times" and that "the program was reasonably calculated to provide meaningful benefit, appropriate in light of [Jack's] circumstances." (H.O. Rpt. at 14.)

## VI.    FACTS

To assess whether Jack was denied a FAPE during the relevant period, this Court must consider the evidence within the administrative record, including the Hearing Officer's decision, the hearing transcripts, various administrative exhibits introduced by both parties, and Jack's relevant IEP.

### a.  Background

Parent's claims arise solely from the period of January 27, 2016 through May 8, 2017, during which Jack was a sixth and seventh grade student. (H.O. Rpt. at 1.) The following factual background offers context for the parties' respective contentions.

Jack transferred to the District in November, 2013, when he was nine years old. (H.O. Rpt., ¶ 1.) Prior to transferring, Jack's previous school evaluated Jack and issued a Section 504 service agreement to support Jack's ADHD diagnosis. (H.O. Rpt., ¶ 7.) After transferring, Jack's parents requested that the District reevaluate Jack. (H.O. Rpt., ¶¶ 7-8.) In a report dated June 9, 2014, the District's evaluator concluded that though Jack exhibited symptoms consistent with ADHD, Jack's educational achievement was not adversely affected and Jack was not eligible for special education services. (H.O. Rpt., ¶ 8.)

During Jack's fifth grade year, Jack's parents scheduled an evaluation with a private psychologist. (H.O. Rpt., ¶ 9.) In a report dated April 17, 2015, the private evaluator found that Jack was eligible for special education under the IDEA classification of Other Health

Impairment ("OHI").[1]  (H.O. Rpt., ¶ 10.)  When Parent shared the private evaluator's

recommendations with the District, the District reevaluated Jack.  (H.O. Rpt., ¶ 15.)  The District

concluded that due to the increased academic demands of higher grade-level curriculum, Jack's

ADHD-related weaknesses were a "substantial detriment to his education."  (Id.)  In a report

dated June 4, 2014, the District identified Jack as a child with the disability of OHI.  (Id.)  The

District's report concurred with most of the private evaluator's recommendations.  (H.O. Rpt., ¶

17.)

Following both evaluations, the District convened an IEP meeting on July 16, 2015, and

drafted an IEP.  (H.O. Rpt., ¶ 18.)  The District could not finalize the draft IEP because Parent,

who participated in the meeting by phone, was unable to sign a Notice of Recommended

Educational Placement ("NOREP").  (H.O. Rpt., ¶ 19.)  When parent later received the NOREP,

Parent purportedly did not realize she needed to sign and return the document for the District to

begin implementing Jack's IEP.  (Id.)

The District convened a second IEP meeting on January 15, 2016 and drafted an IEP

intended to remain in effect until January 13, 2017. (H.O. Rpt., ¶ 29.)  Though the IEP team

considered the recommendations of Parent's private evaluator, Parent was dissatisfied with the

level of proposed services and did not sign the NOREP required to approve and implement the

draft January, 2016 IEP.  (H.O. Rpt., ¶¶ 30, 45.)

   **b.  Relevant Period**

On February 10, 2016, Parent sent an email to the District outlining proposed revisions to

the draft January, 2016 IEP.  (H.O. Rpt., ¶ 47.)  The District replied to Parent on the same day,

indicating that the District had updated the draft January, 2016 IEP to reflect Parent's proposed

revisions.  (Id.)  However, the record indicates that Parent did not sign a NOREP until after the

---

[1] Classifications of disability under the IDEA are set forth in 20 U.S.C. 1401(3)(A)(i), (ii).

District convened another IEP team meeting in April, 2016. (H.O. Rpt., ¶ 68.) The April, 2016, IEP provided for all services offered in the draft January, 2016 IEP, included Parent's proposed revisions, and integrated the results of an occupational therapy evaluation administered by the District. (H.O. Rpt., ¶ 52.) Parent signed and returned a NOREP on April 26, 2016, after which the District began officially implementing the April, 2016, IEP. (H.O. Rpt., ¶¶ 68-9.)

### c. Content of Jack's Evaluations and Relevant IEP

#### i. *Recommendations of Parent's Private Evaluator – April 17, 2015*

Parent's private evaluator recommended: placing Jack in a setting with a low teacher-to-student ratio; specialized instruction in study skills, general learning, and memory strategies; support for overall organization and specific intervention for multistep projects; note-taking accommodations; testing and assignment modifications; research-based instruction and accommodations for Jack's deficits in writing; and general modifications and accommodations to address Jack's educational needs. (H.O. Rpt., ¶¶ 11-13.) In addition, the evaluator recommended a comprehensive functional behavioral assessment, a behavioral intervention plan, and an occupational therapy evaluation. (Id.)

#### ii. *District's Evaluation – June, 2015*

Due to the effects of Jack's ADHD diagnosis, the District's June, 2015 evaluation identified Jack as a child with the disability of OHI. (H.O. Rpt., ¶ 15.) The District's report recommended: a highly-structured environment; previewing, chunking, and repetition of lessons; visual delivery of information; supports for note-taking, written expression, organization and following multi-step directions; teaching of reading comprehension strategies, self-monitoring skills, and study strategies; testing accommodations; and consideration of performing a functional behavior assessment and an occupational therapy assessment. (H.O. Rpt., ¶ 16.)

### iii. *IEP – April, 2016*

Like the draft January, 2016 IEP (never officially approved by Parent), Jack's April, 2016 IEP ("April IEP") called for placement in itinerant learning support. (H.O. Rpt., ¶¶ 34, 52.) The April IEP stated:

> Jack requires specialized instruction to meet the outcomes identified in his measurable annual goals…. This instruction will require direct, explicit teaching of skills that are not within the scope of grade level curriculum. Modification of the general curriculum to reduce or eliminate grade level outcomes, together with parallel instruction provided by special education or other staff, or provided through use of technology-assisted learning, would allow such skills introduction to occur within the regular classroom. The simultaneous delivery of unrelated parallel instruction, however, would be mutually distracting and would deny Jack any meaningful interaction with his peers. During such instruction, Jack could not participate in the instruction or activities in which his non-disabled peers would be engaged. The required replacement instruction will therefore occur in a special education classroom…Jack will not participate with students without disabilities in the regular education class in Language Arts during small group instruction, when he will receive instruction from the learning support teacher on his instructional level (in either the regular education class as part of the inclusive model, or in the learning support classroom).

(Coatesville Area School District Exhibit "SD" – 8 at 2.) Because the April IEP stated that the instruction could occur either in the regular education class as part of an "inclusive model" *or* in the learning support classroom, the IEP did not definitively offer direct instruction[2] in Jack's areas of need. (H.O. Rpt., ¶ 61.)[3]

The April IEP provided the following measurable goals: a written expression goal; a mathematics fluency goal; a behavioral goal addressing Jack's ability to focus on assigned tasks

---

[2] During the administrative hearing, Parent's counsel and Jack's sixth grade special education teacher engaged in discussion about the definition of "Direct Instruction," which was described as an "educational methodology" of "specific instruction" consisting of "teacher-directed activit[ies]" using "small group" or "face-to-face instruction" to teach "carefully-articulated lessons…." (AHT at 104-105.)

[3] The Hearing Officer acknowledged that the April, 2016 IEP contained ambiguous language regarding whether Jack would receive special education services in the regular education classroom or in the special education classroom. The Hearing Officer criticizes this confusing language saying, "[w]hile I find that this somewhat ambiguous prescription of placement did not, on this record, amount to a denial of FAPE, I do not intend to condone such ambiguous IEP draftsmanship as a general matter." (H.O. Rpt., n. 4.)

in the classroom for all core subjects; and an organizational goal.[4]  (H.O. Rpt., ¶¶ 35-38, 52); (SD – 8 at 45-54.)  Additionally, the April IEP incorporated the results of an occupational therapy evaluation, identifying Jack as eligible for at least 45 minutes of direct occupational therapy services each month to address visual-motor perception and visual-motor integration deficits.  (H.O. Rpt., ¶¶ 55-56.)

The April IEP offered the following specially designed instruction and modification provisions:

> Tests and quizzes given in a small group, quiet setting with extended time as needed; Parent notification of upcoming assignments and assessments; Use of calculator when not assessing basic fact knowledge; Teacher-made study guides; opportunity for repetition of key points and concepts; opportunities to preview key concepts and, when possible, new information should be chunked; auditory information should also be presented in visual format; additional support for the writing process including the use of graphic organizers and editing support' the use of checklists and models to help Jack understand expectations; the use of numbered multi-step directions; practice drilled math facts; provide Jack with frequent verbal cues to remain on task and engaged; provide physical cues such as proximity to increase time on task; allow Jack time to purge and organize materials; provide Jack with an organization checklist to use at the end of the day; Jack will check-in with his special education teacher in assigned room and check-out with his special education support service teacher at the end of the day for organizational support.

(H.O. Rpt., ¶¶ 39-42, 52); (SD – 8 at 55-57.)

Notably, the April IEP incorporated multiple recommendations of Parent's private evaluator and included most of the special education services recommended by the District's June, 2015 evaluation report. (H.O. Rpt., ¶¶ 60, 65.)  During the April, 2016 IEP meeting, the team discussed performing a Functional Behavioral Assessment, but Jack's case manager and special education teacher did not consider a behavior plan to be necessary. (H.O. Rpt. ¶ 66.)

### d.  Implementation of the April, 2016, IEP

---

[4] In an email sent on February 10, 2016, Parent asked the District to add a behavioral goal and an organizational goal to Jack's draft January, 2016 IEP.  The District incorporated Parent's requests verbatim in both the draft January, 2016 IEP and the final April, 2016 IEP.  (Parent Exhibit "P" 12 at 6-8.); (SD – 7); (SD – 8.)

During the first several months of the relevant period, the District began implementing parts of the draft January, 2016 IEP despite not having received a signed NOREP from Parent. (H.O. Rpt., ¶ 46.)  Full implementation of the April IEP began during the second half of Jack's sixth-grade year after Parent signed and returned a NOREP.  (H.O. Rpt., ¶¶ 68-69.)  The record supports the Hearing Officer's determination that Jack's special education teachers, regular education teachers, and service providers implemented the April, 2016, IEP substantially during Jack's sixth and seventh grade years. (H.O. Rpt., ¶ 69.)

### i. *Sixth Grade Implementation – 2016-2017 School Year*

The Hearing Officer's decision cites to testimony from Jack's special education teacher who was primarily responsible for implementing the April IEP during Jack's sixth grade year. (H.O. Rpt., ¶¶ 69-79.)  At the administrative hearing, Jack's sixth grade special education teacher stated, "I ensured that accommodations were being followed by regular ed teachers.  I had Jack in my classroom for tests and quizzes.  I also pushed into his math class."  Later in her testimony, the special education teacher provided,

> I met with Jack at the beginning of…the April IEP to teach him and label his folders per subjects and to make sure he organized each thing into the correct folder.  And then I also gave him a laminated checklist for him to use in his classes.  I had numbers and a box next to it that he could check off…for long class work assignments or tasks to complete his regular ed class.  He could—he or the teacher could write down those steps so that he could check them off when they were completed.  And they taught him how to use that.  And I also taught him how to use the checklist…that was in his locker as far as making sure that he had the correct materials with him every day for his… classes….

(AHT at 137.)  The special education teacher also testified that Jack used a behavioral checklist to increase self-awareness and that Jack discussed the checklist with his regular education teachers.  (AHT at 138-39.)

The transcript indicates that Jack's regular education teachers were aware of Jack's IEP when it officially came into effect in April, 2016, took part in implementing the April IEP, and were responsive to Jack's behavioral issues. (H.O. Rpt., ¶¶ 69-74.)

### ii. *Seventh Grade Implementation*

The Hearing Officer's decision cites to testimony from Jack's special and regular education teachers and Jack's occupational therapist who took part in the implementation of the April IEP during Jack's seventh grade year.[5] (H.O. Rpt., ¶¶ 69-79.)

Jack's seventh grade special education teacher testified that she was responsible for monitoring Jack's progress on the April IEP goals and pulled Jack from his Language Arts class on a daily basis for instruction in writing and organization. (AHT at 173-74.) Additionally, she checked Jack's locker and performed periodic class checks to monitor Jack's behavior. (AHT at 183-192.)

The administrative record supports the Hearing Officer's conclusion that Jack's regular education teachers "implemented IEP modifications that addressed and supported Student's needs regarding attention and organization, including study guides to accommodate note-taking and previewing/repetition." (H.O. Rpt., ¶ 74; AHT at 265-315.)

The administrative record supports the Hearing Officer's conclusion that Jack's occupational therapist "implemented the IEP's occupational therapy goals and specially designed instruction addressing Jack's visual-motor weaknesses and attention needs." (H.O. Rpt., ¶ 73.) The District's Occupational Therapist testified that she met with Jack for 45 minutes each month to work on the occupational goals set forth in Jack's IEP and provided consultative services approximately once a month. (AHT at 239-261.)

---

[5] Testimony from the administrative hearing indicates that the April 2016 IEP was in effect until the next annual IEP meeting, scheduled for April, 2017. (AHT at 198.)

### e. Jack's Progress

#### i. *Progress on Measurable Goals*

The Hearing Officer concluded that Jack "made progress…with regard to some aspects of written expression." (H.O. Rpt., ¶ 75.) Progress reports provided by the District indicate that Jack was making "good" or "satisfactory progress" on his writing goal throughout the relevant period. (SD – 9 at 1-2.)

The Hearing Officer concluded that Jack "made progress…with regard to…math fluency." (H.O. Rpt., ¶ 75.) Progress reports provided by the District indicate that by the second marking period of Jack's seventh grade year, Jack had attained his math goal. (SD – 9 at 3-4.)

The Hearing Officer concluded that Jack "made progress with regard to the goal for attention until the second marking period in 2017, when measurement could not be made due to Student's lack of cooperation." (H.O. Rpt., ¶ 75.) Progress reports indicate that during the last marking period of sixth grade and the first marking period of seventh grade, Jack was making progress and even "approaching mastery," but that Jack made "no progress" and refused to comply" during the second marking period of seventh grade. (SD – 9 at 5-6.)

The Hearing Officer concluded that Jack "made progress…with regard to…organization of materials and homework completion, except for the second marking period of 2017, when Student's completion rate regressed." (H.O. Rpt., ¶ 75.)

The administrative record confirms the Hearing Officer's conclusion that Jack "mastered the occupational therapy goals for filling out a mathematics worksheet in a one-to-one, low distraction setting, and far point copying." (H.O. Rpt., ¶ 75.); (SD – 9 at 9-10.)

#### ii. *Grades*

The record supports the Hearing Officer's conclusion that Jack "functioned at grade level in all subjects" and that Jack's "marks were passing throughout the period, and indeed were often 'A's' and 'B's.'" (H.O. Rpt. at 20.)

## VII.    LEGAL STANDARDS

### a.    Review of State Administrative Hearing Records

"When deciding cases under IDEA, federal district courts apply a nontraditional standard of review, referred to as "modified *de novo*…." D.S., 602 F.3d at 564; Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004); S.H. v. State-Operated Sch. Dist., 336 F.3d 260, 270 (3d Cir. 2003). Under a "modified *de novo*" standard, the district court must give "due weight" to the administrative record and must consider factual findings from the administrative proceedings "prima facie correct." Ridley, 680 F.3d at 268 (citing Rowley, 458 U.S. at 206); (string cite omitted). If "a reviewing court fails to adhere to the [factual findings of the administrative record]," it is "obliged to explain why." S.H., 336 F.3d at 270 (internal citations omitted).

The district court must accept the Hearing Officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." Carlisle Area Sch. v. Scott P. ex rel Bess P., 62 F.3d 520, 528-29 (3d Cir. 1995). Generally, the district court must "avoid the impression that it is substituting its own notions of sound educational policy for those of the agency it reviews." Ridley, 680 F.3d at 268; S.H., 336 F.3d at 270; Susan N., 70 F.3d at 757. The district court is therefore required to give "requisite deference" when the hearing officer affords more or less weight to the testimony of various experts based upon the nature of their expertise or the amount of time spent with the child. Shore, 381 F.3d at 200.

"Within the confines of these standards, a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate." Ridley, 680 F.3d at 268 (citing D.S., 602 F.3d at 564).

### b. Burden of Persuasion

Though the IDEA does not "specify which party bears the burden of persuasion before the district court," the Third Circuit places the burden of persuasion on the party seeking relief. Ridley, 680 F.3d at 270. Therefore, Parent bears the burden of persuasion in the case at bar.

## VIII. DISCUSSION

The issues in this case are: (i) Whether the Hearing Officer erred in finding that the District offered Jack a FAPE from January 27, 2016 through May 8, 2017; (ii) Whether the Hearing Officer erred in denying relief under Section 504; and (iii) Whether this Court must dismiss Parent's ADA claim for failure to exhaust administrative remedies.

### c. Contentions

#### i. *IDEA Claim*

Parent contends that the District denied Jack a FAPE: (1) by offering Jack an IEP that did not address all Jack's areas of educational need; (2) by failing to implement Jack's IEP as required by the IDEA; and (3) because Jack failed to make meaningful educational progress in multiple areas of need. (Parent Brief at 18-29.)

##### 1. Adequacy of Jack's IEP

Parent contends that the District failed to address all of Jack's educational needs because Jack's IEP lacked provisions for "study skills" and "organizational/ executive functioning skills." (Parent Brief at 18.) Parent also alleges that though the District's IEP stated that Jack would receive instruction in a special education classroom or a learning support classroom," "such a

classroom did not even *exist* in the District." (Parent Brief at 20.) Additionally, Parent argues that because Jack's IEP did not provide him with a Positive Behavior Support Plan ("PBSP") based on a Functional Behavioral Assessment ("FBA"), the IEP "failed to provide appropriate supports for Jack's well-documented behavioral needs" including "difficulty sustaining attention, distractibility, blurting out, rushing through work, missing social cues, [and] fidgeting." (Parent Brief at 20-21.)

In response, the District contends that Jack's IEP was appropriate under the circumstances and that the Hearing Officer correctly determined that the District provided Jack a FAPE. (District Brief at 18-32.) The District contends that "Jack's slight weaknesses in executive functioning were more than adequately addressed in his IEP." (District Brief at 26.) The District highlights that Jack's IEP included a provision for Jack to take "his tests and quizzes in a special education classroom," contained "goals for organization and remaining on task," and provided for "instruction in organizational strategies and checks for organization." (District Brief at 27.) The District contends that Jack's IEP team, which included Parent, collectively determined that under the circumstances, an "itinerant level of support" was appropriate for Jack. (District Brief at 20.) Though there was a special education classroom available to Jack, the District argues that "Jack did ***not*** need to be in a learning support classroom for the entire language arts period and/or for the entire math period and/or for any other extended period of time." (District Brief at 18-19.)

In response to Parent's assertion that the District denied Jack a FAPE by not performing an FBA and omitting a PBSP, the District argues that "not every 'behavior' requires an FBA and/or a PBSP." (District Brief at 26.) The District asserts that Jack's primary problematic behavior was "off task, inattentive behavior, which…lead to not always turning in assignments

and/or homework." (District Brief at 19.) The District argues that "this single 'behavior' was addressed with a goal and severally specially designed instructions," and alleges that Jack did not need an FBA/PBSP. (District Brief at 26.)

## 2. Implementation of Jack's IEP

Parent contends that the Hearing Officer incorrectly concluded that "on the whole," the District implemented the IEPs with fidelity. (Parent Brief at 23.) Parent cites language from the Hearing Officer's decision acknowledging that there were "some flaws in the implementation of the IEP" and argues that

> the *uncontradicted* evidence showed: (a) Jack was supposed to be provided small group instruction in a learning support classroom, but never was; (b) teachers admitted to not following his IEP in major respects; and (c) Jack's teachers felt free to ignore the requirements of the IEP based on their own personal judgement as to whether agreed-upon supports were 'necessary.'

(Parent Brief at 22-23) (emphasis added by Parent).

In response, the District contends that there were multiple special education classrooms where Jack went to take tests and to receive instruction from special education teachers. (District Brief at 20.) Additionally, the District's brief incorporates extensive testimony from Jack's special and regular education teachers regarding their efforts to implement the April IEP. (District Brief at 5-12.)

## 3. Jack's Progress

Finally, Parent contends that Jack failed to make meaningful progress, and that the Hearing Officer applied an incorrect legal standard when assessing whether Jack received a FAPE. (Parent Brief at 23-28.) Parent cites the following language from the Hearing Officer's decision: "[s]tudent also made *some progress* on IEP goals…[p]rogress monitoring data was mixed, but they showed *progress* on a number of goals." (Parent Brief at 24) (emphasis added

by Parent); (H.O. Rpt. at 20.)  Parent claims that "[u]nder the correct 'meaningful educational progress' standard, measured in light of Jack's educational potential, it is manifest that Jack did not make appropriate meaningful progress in his education during the time period at issue." (Parent Brief at 24.)  Parent specifically criticizes the Hearing Officer's purported "over-reliance" on Jack's report card grades.  (Parent Brief at 26.)

In response, the District contends that Jack made meaningful educational progress, and that the Hearing Officer applied the correct legal standard.  (District Brief at 28.)  The District cites the following language from the Hearing Officer's decision: "The record is more than preponderant that Student made *appropriate and meaningful progress* during the relevant time." (District Brief at 28); (H.O. Rpt. at 20) (emphasis added by the District).  Additionally, the District argues that "there was not even a suggestion that Jack's grades were not reflective of true functioning, and, therefore there is absolutely no reason for the Court to de-emphasize the grades or disagree with the Hearing Officer's reliance on them."  (District Brief at 32.)

### ii. *Section 504 Claim*

Parent contends that "because the District violated IDEA by failing to offer Jack appropriate IEPs, it also violated Section 504."  (Parent Complaint, ¶¶ 68-80.)  Parent argues that the necessary elements of a Section 504 claim are satisfied because Jack is disabled as defined by the act, is qualified to participate in school activities, the school receives federal funding, and Jack was "excluded from participation in, denied the benefits of, or subject to discrimination at the school."  (Parent Complaint, ¶¶ 68-80.)

In response, the District contends that the Hearing Officer correctly determined Parent's Section 504 claim was invalid.  (District Brief at 33-34.)  The District argues that because Parents "adduced no explicit evidence of discrimination on the basis of disability" and "did not

argue that the evidence established a separate and distinct claim under § 504," a finding that the District provided Jack with a FAPE suggests there is no basis for finding that the District violated Section 504.  (District Brief at 33-34.)

### iii.  *ADA Claim*

Though Parent did not raise an ADA claim in her Due Process Complaint, Parent argues that "because the District violated Section 504, it also violated the ADA."  (Parent Complaint, ¶¶ 81-82.)  Parent claims that the District's "IEPs failed to ensure that Jack was provided with appropriate educational and related services…which he required in order to have access to the District's programs….and to make appropriate…educational progress equal to children without disabilities in violation of the ADA."  (Parent Complaint, ¶¶ 81-82.)  Additionally, Parent alleges that "the Office of Dispute Resolution ("ODR"), the forum in which the family raised its administrative claims, does not address or resolve claims raised under the ADA" and therefore "exhaustion is excused, because raising ADA claims in a Due Process proceeding, which will not consider or decide such claims, would be futile."  (Parent Reply Brief at 7.)

In response, the District argues that the remedies sought by Parent are identical to those sought under Parent's IDEA claim, and that "[b]ecause there is nothing new, [Parent's] ADA claim must be dismissed for failure to exhaust administrative remedies."  (District Brief at 34-37.)

### d.  Analysis

#### i.  *Did the Hearing Officer err in finding that the District offered Jack a FAPE from January 27, 2016 through May 8, 2017?*

The Hearing Officer determined that:

(1) the District offered services based upon an appropriate understanding of Jack's educational needs, and offered services that addressed all of those needs appropriately in light of Student's circumstances;

(2) the District educators implemented the IEP appropriately in view of Jack's circumstances and needs; and

(3) retrospectively, the record shows that Jack made appropriate progress during the relevant period.

(H.O. Rpt. at 14.)  Ultimately, the Hearing Officer concluded that the District "offered and provided a FAPE to [Jack]" and that "the program was reasonably calculated to provide a meaningful benefit, appropriate in light of [Jack's] circumstances."  (H.O. Rpt. at 14.)

For the reasons set forth below, this Court will affirm the Hearing Officer's preliminary determinations, as well as the Hearing Officer's ultimate conclusion that Jack received a FAPE during the relevant period.

## 1. The District offered services based upon an appropriate understanding of Jack's educational needs and addressed those needs appropriately in light of Jack's circumstances

When a parent challenges the adequacy of a child's IEP, the reviewing court must conduct a two-fold inquiry.  Mary Courtney T. v. Sch. Dist., 575 F.3d 235, 249 (3d Cir. 2009). A court must (1) consider whether the school district complied with the IDEA's procedural requirements and (2) determine whether the educational program complies with the IDEA's substantive requirements.  D.S., 602 F.3d at 564-65; Mary T., 575 F.3d at 249 (citing Rowley, 458 U.S. at 206-07).

Parent's argument regarding the adequacy of Jack's IEP falls under the "substantive" prong of the court's two-fold inquiry.[6]  D.S., 602 F.3d at 565.  The Supreme Court recently

---

[6] In D.S., the student's parent argued that the school "ran afoul of the IDEA's procedural requirements" because the IEP "failed to program for D.S.'s areas of educational need."  D.S., 602 F.3d at 565.  The Third Circuit reasoned that parent's argument "misses the mark" because "[t]he content of an IEP as such does not implicate the IDEA's procedural requirements for content is concerned with the IEP's substance, i.e., whether the IEP 'reasonably [is] calculated to enable the child to receive educational benefits.'"  Id.  "Courts in the Third Circuit have, in the past, condensed apparent procedural violations—like failing to include particular provisions in a disabled student's IEP, and thus allegedly failing to program for the student's recognized educational needs—into a substantive question of

clarified that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 999 (2017). In the Third Circuit, courts hold that an IEP must provide services "reasonably calculated to enable a child to receive meaningful educational benefits in light of the student's intellectual potential." D.S., 602 F.3d at 557; Shore, 381 F.3d at 198 (string cite omitted).

Importantly, a student's IEP "need not necessarily provide 'the optimal level of services' that parents might desire for their child." D.S., 602 F.3d at 557. Instead, The IDEA requires that an IEP must consist of "educational instruction specially designed to meet the unique needs" of the eligible student. Endrew F., 137 S. Ct. at 999 (citing 20 U.S.C. §§ 1401(29), (14). An IEP is not a "form document" and "[a] focus on the particular child is at the core of the IDEA." Endrew F., 137 S. Ct. at 999.

Therefore, it is incumbent upon this Court to begin its analysis by focusing on *Jack*. As stated above, both the Supreme Court and the Third Circuit emphasize that an IEP must be tailored to the *particular* child for which it is crafted; Jack's IEP must aim to enable *Jack* to make progress and receive meaningful educational benefits in light of *Jack's* circumstances and intellectual potential. See Endrew F. 137 S. Ct. at 999; D.S., 602 F.3d at 557; Shore, 381 F.3d at 198.

At the beginning of the relevant period, Jack was a sixth grade student. Jack's teachers reported that Jack had difficulty sustaining attention, often rushed through work, had difficulty organizing assignments and academic materials, and struggled with writing and math word problems. However, Jack's teachers also reported that Jack "is a great kid" who "excelled in

---

whether a student was offered meaningful educational benefit in the form of a FAPE." Coleman v. Pottstown School Dist., 983 F.Supp.2d 543, 564 (E.D. Pa. Nov. 22, 2013).

reading," "likes to participate," and "wants to do well in school." (AHT at 124, 197, 284.) Despite Jack's documented struggles, Jack performed on grade level in all areas of the curriculum, often earning "A's" and "B's." Impressively, during Jack's seventh grade year, he was enrolled in Pre-AP or college preparatory level courses for many core subjects.

This Court recognizes that Jack's "circumstances" are shaped by Jack's ADHD-related weaknesses, but that Jack's "intellectual potential" must be understood in light of his proven academic successes. Thus, this Court will consider the adequacy of the District's IEPs in the context of the Hearing Officer's determination that:

> the salient circumstances were that [Jack] functioned on grade level in all core and special subjects, that [Jack] was progressing from grade to grade, that [Jack's] academic performance was consistent with [Jack's] tested cognitive potential, and that [Jack] benefited and remained motivated in the regular education environment, with all its social benefits.

(H.O. Rpt. at 16.)

First, Parent contends that the District failed to address all of Jack's educational needs— that Jack's IEP was inadequate —because Jack's IEP purportedly lacked provisions for study skills, organizational skills, and executive functioning skills. Importantly, the April IEP is the only IEP officially approved by Parent and applicable to the relevant period. Contrary to Parent's contentions, the record indicates that Jack's April IEP provided goals and instruction tailored to Jack's ADHD-related weaknesses while acknowledging maintaining opportunities for high-level academic engagement in the regular education classroom.

In Parker C. through his Parents Todd and Crystal C. v. W. Chester Area Sch. Dist., 2017 WL 2888573 (E.D. Pa. July 6, 2017), the court examined the adequacy of an IEP created for a student with multiple physical, social, behavioral, and neurocognitive needs. The parents argued that their child was denied a FAPE "because his IEPs…included no goals in the area of executive

functioning, with the exception of task initiation and completion." Id. at *8. The court reasoned that "executive functioning is an expansive concept" and concluded that "it was not erroneous for the Hearing Officer to conclude that task initiation goals and memory processing supports, which clearly aim at aiding 'working memory, inhibition and cognitive flexibility,' were targeted at [student's] executive functioning needs." Id. at *9. The court also emphasized that "a district is 'not required to provide a specific program or employ a specific methodology requested by the parent.'" Id. at *9 (referencing Rowley, 458 U.S. at 199.)

In the instant case, the April IEP provided a behavioral goal addressing Jack's ability to focus on assigned tasks, measured through daily data collection. Additionally, Jack's April IEP included a measurable organizational goal that provided for direct instruction in organizational strategies through daily checks with a special education teacher and incorporated multiple provisions of Specially Designed Instruction, including parent notification of upcoming assignments, teacher-made study guides, the use of multi-step directions, and frequent verbal cues to remain on task and engaged. Like the court in Parker, this Court concludes that these provisions of Jack's IEPs adequately address Jack's executive functioning needs.

Second, Parent contends that the District's IEP did not address all areas of Jack's educational needs because the District lacked a learning support classroom. Supported by the administrative record, this Court will adhere to the Hearing Officer's finding that parent misapprehended the level of services provided to Jack:

> Parent's testimony reveals a significantly inaccurate understanding of the services available to Student at school and how they were implemented. In particular, Parent testified that she was unhappy that Student would not have a quiet place for testing, due to an apparently confusing statement at an IEP meeting about pull-outs being unavailable; yet, multiple witnesses testified credibly that the Student and others with this accommodation were pulled to quite areas for testing routinely…I find that these misunderstandings reduce Parent's reliability regarding the offering and implementation of Student's program."

(H.O. Rpt. at 12.)

Additionally, this Court points to the IDEA's requirement that children must be educated in the least restrictive environment, meaning that "[t]o the maximum extent appropriate, children with disabilities…are educated with children who are not disabled." 20 U.S.C. 1412(a)(5)(A). The record indicates that the District's delivery of itinerant support, either in the regular education setting or, as needed, in a learning support classroom was appropriate. Jack's teachers understood Jack to be a capable of functioning in the regular education setting with various supports, Parent valued Jack's participation in the regular education environment,[7] and Jack demonstrated that he was capable of functioning in pre-AP courses.[8]

Finally, Parent contends that the April IEP failed to address Jack's behavioral needs because it did not guarantee that Jack would receive a PBSP based on an FBA. When designing an IEP for a student whose "educational progress may be impeded by behavioral issues," school districts must "consider the use of positive behavioral interventions and supports, and other strategies to address that behavior." Coleman v. Pottstown Sch. Dist., 983 F.Supp.2d 543, 565 (E.D. Pa. Nov. 22, 2013), aff'd in part, 581 Fed.Appx. 141 (3d Cir. 2014); 34 C.F.R. § 300.324(a)(2)(i). The IDEA does not, however, "require that a school use a functional behavioral assessment when initially testing students for suspected disability." D.K. v. Abington Sch. Dist., 696 F.3d 233, 251 (3d Cir. 2012). The IDEA specifically calls for an FBA to be performed, "as appropriate," when a child "who is already being educated pursuant to an IEP

---

[7] See Plaintiff's Exhibit 12 at page 33, where in an email to Jack's seventh grade special education teacher, Parent emphasizes that she does not want Jack to be removed from Pre-AP classes.
[8] See Oberti v. Bd. of Educ., 995 F.2d 2014, 1215 (3d Cir. 1993) (discussing IDEA's mainstreaming requirement and introducing a two-part test to assess whether a school "is in compliance with IDEA's mainstreaming requirement.") This Court declines to apply the two-part test, as the record strongly indicates that Jack was appropriately mainstreamed.

continues to exhibit behavioral problems" such that the child must be removed from the child's current placement because of the behavioral issue. Id. at n.7; U.S.C. 1415(k)(1)(D).

In Coleman, the court assessed allegations that a school failed "to address [student's] ongoing behavioral issues, particularly by failing to set quantifiable or measurable goals" or "conduct an FBA." Coleman, 983 F.Supp.2d at 570-71. The student in Coleman exhibited various behavioral issues but "no FBA was conducted" because "the district determined that no FBA was necessary at the time." Id. at 558. Instead, the school district provided an IEP that offered specially designed instruction and modifications. Id. at 556-58. The court reasoned that though "the IDEA requires that a school district consider 'positive behavioral interventions'" when crafting an IEP for a student with behavioral issues, this requirement does not mandate an FBA, "at least not where the IEP sets forth other means to address the problematic behaviors." Id. at 565 (internal citations omitted).

In the instant case, Jack's primary behavioral issues were difficulty sustaining attention, blurting out, rushing through work, and frequent fidgeting. Like the school in Coleman, the District in the instant case did not perform an FBA because the District determined that an FBA was unnecessary. However, also similar to the facts in Coleman, the District offered Jack an IEP that included specialized instruction for learning-related behaviors and offered various forms of specially designed instruction. Additionally, Jack's IEP included measurable behavioral and organizational goals. As in Coleman, the District clearly acknowledged Jack's behavioral issues and provided an IEP with behavioral goals, interventions, supports, and other strategies to address that behavior. Because Jack does not fall into the category of students for which the IDEA requires an FBA, this Court concludes that the District offered an IEP containing proactive measures to address Jack's behavioral issues.

Based on the foregoing reasons, this Court finds that the District offered Jack an IEP reasonably calculated to make progress and receive meaningful educational benefits in light of Jack's attention-related difficulties and proven capacity for academic success.

### 2. The District educators implemented the IEP appropriately in view of Jack's circumstances and needs

"To prevail on a claim that a school district failed to implement an IEP, a plaintiff must show that the show that the school failed to implement substantial or significant provisions of the IEP, as opposed to a mere *de minimis* failure, such that the child was denied a meaningful educational benefit." Melissa S. v. Sch. Dist., 183 Fed.Appx. 184, 187 (3d Cir. 2006); Damian J. v. Sch. Dist., 2008 WL 191176, *2 (E.D. Pa. Jan. 22, 2008).

Parent alleges that in addition to offering Jack an inadequate IEP, the District also failed to implement the April IEP as written. Parent's contentions appear to primarily arise from ambiguity in the drafting of Jack's IEP as to the setting in which Jack would be educated. The IEP states, "[Jack] will receive instruction from the learning support teacher on his instructional level (in either the regular education class as part of the inclusive model, or in the learning support classroom)." (SD – 8 at 2.) The Hearing Officer addresses the ambiguity by noting that the provision amounts to a "somewhat ambiguous prescription of placement."[9] However, this Court agrees with the Hearing Officer's conclusion that "on this record" the ambiguity did not "amount to a denial of FAPE." (H.O. Rpt., n.4.)

Testimony from Jack's teachers indicate that during Jack's sixth grade year, his special education teacher made sure the regular education teachers were following Jack's IEP. The record indicates that Jack went to his special education teacher's classroom for tests and quizzes, and that the special education teacher "pushed-in" to Jack's math class. Additionally, credible

---

[9] See *supra* note 3.

testimony indicates that Jack received instruction in organization (including how to use several organizational checklists) and used a behavioral checklist interactively with his special and regular education teachers.

During seventh grade, the record indicates that Jack was pulled from his Language Arts class on a daily basis for one-on-one instruction from his special education teacher. The record indicates that Jack's special education teacher monitored his writing and behavioral goals, worked with Jack on his math goal, helped Jack complete missed homework assignments, and helped with Jack's organizational goal by monitoring his locker, binders, labeled folders, and purging unnecessary documents.

Finally, the record indicates that Jack received 45 minutes of small group and one-on-one instruction from the District's Occupational Therapist to meet the occupational therapy goals set forth in the April IEP.

This Court concludes that Parent has not established that the District failed to implement substantial provisions of the IEP. Because the record indicates any deviations in implementation were *de minimis*, Jack nonetheless received a meaningful educational benefit. This Court affirms the Hearing Officer's determination that though "the record disclosed some flaws in the implementation of the IEP, on the whole the record shows preponderantly that it was implemented appropriately." (H.O. Rpt. at 18.)

### 3. Jack made appropriate progress during the relevant period

In Endrew F., the Supreme Court highlighted that there is no set formula for determining what constitutes "appropriate services" or a "meaningful educational benefit." Endrew F., 137 S. Ct. at 1000. However, when children are "fully integrated in the regular classroom, as the act prefers," a school district must provide "a level of instruction reasonably calculated to permit

advancement through the general curriculum" by enabling "the child to achieve passing marks and advance from grade to grade." Id. at 999-1000.

Importantly, the "'reasonably calculated' qualification reflects that crafting an appropriate program of education requires a prospective judgment by school officials," such that a court should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time that they were made. Endrew F., 137 S. Ct. at 999; Fuhrmann ex rel. Fuhrmann v. E Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir.1993); Susan N., 70 F.3d at 762.

In E.D. v. Colonial Sch. Dist., 2017 WL 1207919, *13 (E.D. Pa. Mar. 31, 2017), the court upheld a Hearing Officer's conclusion that a student who "did not make progress in all categories" was nonetheless provided a FAPE. The court reasoned,

> For a child like E.D., who was "fully integrated in the regular classroom," an IEP typically should be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.' (Internal citations omitted). There was no question that E.D. made progress, and that she advanced to the First Grade. While it is true that E.D. did not make progress in all categories, this does not mean that she was denied a FAPE.

(Id.)

In the instant case, Parent argues that Jack did not make meaningful progress, and that the Hearing Officer applied a "some progress" standard rather than the correct "meaningful progress standard" to determine that Jack received a FAPE. Additionally, Parent alleges that the Hearing Officer's analysis relied too heavily on Jack's grades.

Parent's contentions are simply not supported by the record. The Hearing Officer's decision correctly identified the appropriate standard established in leading Supreme Court and Third Circuit precedent, writing "[t]he IEP must be 'reasonably calculated' to enable the child to receive appropriate services in light of the child's individual circumstances" and "services are

appropriate when they are reasonably calculated to provide a child with 'meaningful educational benefits.'" (H.O. Rpt. at 13) (citing Endrew F., 137 S. Ct. at 999 (2017); Shore, 381 F.3d 194, 198 (3d Cir. 2004) (string cite omitted)). The Hearing Officer goes on to apply the appropriate legal standard by concluding that [Jack] "made appropriate and meaningful progress during the relevant period of time." (H.O. Rpt. at 20-21.)

Next, contrary to Parent's contentions, the Hearing Officer acknowledged Jack's satisfactory grades while also pointing to Jack's progress on IEP goals, including Jack's organizational and behavioral goals. The record indicates that Jack was making "progress," or "good progress," with "mastery" of some goals and "regression" or "inconsistent performance" on others. Similar to the student in Colonial School Dist., Jack's mixed progress does not indicate that he was denied a FAPE. Jack was clearly progressing from grade to grade, and though Jack did not show linear progression on all IEP goals, the record supports the Hearing Officer's conclusion that, "on the whole, [Jack] made progress on his IEP goals." (H.O. Rpt. at 21.)

Most importantly, as established by the Supreme Court and the Third Circuit, this Court must examine the "reasonableness" of the IEP at the time it was crafted; evidence acquired subsequent to the IEP's formation—evidence of Jack's actual progress—should be used only to shed light upon the reasonableness of the IEP offered to Jack. Though the Supreme Court notes that not "every handicapped child who is advancing from grade to grade is automatically receiving a [FAPE]," this Court finds that Jack's collective progress—evidenced by both grades and IEP progress reports—indicate that Jack's IEP was reasonably calculated to allow Jack to make meaningful progress in areas of academic and functional advancement. Endrew F., 137 S. Ct. at 1000 n.2.

**4. The Hearing Officer was correct in finding that the District offered Jack a FAPE from January 27, 2016 through May 8, 2017**

The IDEA provides that in any civil action brought under the act, the Court shall base its decision on the preponderance of the evidence, and "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(h)(i)(2)(C)(iii). Based upon the foregoing, this Court concludes that (1) the District offered Jack an IEP reasonably calculated to allow Jack to make progress and receive meaningful educational benefits in light of Jack's attention-related difficulties and proven capacity for academic success; (2) the District, on the whole, implemented Jack's IEP with fidelity and Parent failed to show that any deviations in implementation were more than *de minimis*; and (3) Jack's progress on IEP goals and satisfactory grades indicate that, at the time it was crafted, the April IEP was reasonably calculated to allow Jack to make appropriately ambitious, meaningful progress in all areas of academic and functional need. Therefore, this Court finds that on the preponderance of the evidence, the Hearing Officer correctly concluded that the District offered Jack a FAPE during the relevant period.

## ii. *Did the Hearing Officer err in denying relief under Section 504?*

Parent's second claim arises under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), which states

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency….

29 U.S.C. §794(a).

The IDEA and Section 504 are similar causes of action. Andrew M. v. Del. Cty. Office of Mental Health and Mental Retardation, 490 F.3d 337, 349 (3d Cir. 2007). Third Circuit case

law makes it clear that "a party may use the same conduct as the basis for claims under both the IDEA and [Section 504]." Id. "However, this language does not indicate that a violation of the IDEA is per se a violation of [Section 504], regardless of whether it meets the independent requirements for an RA violation." Id. To establish that the District violated Section 504, Parent must prove (1) Jack is 'disabled' as defined by the Act; (2) Jack is 'otherwise qualified' to participate in school activities; (3) the District receives federal assistance; and (4) Jack was excluded from participation in, denied the benefits of, or subject to discrimination at the school. Id. at 350 (citing Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 253 (3d Cir. 1999). The Third Circuit holds that failure to offer a FAPE, in violation of the IDEA, can satisfy the fourth element necessary to establish a Section 504 violation, as denial of a FAPE "is denying a disabled child a guaranteed education merely because of the child's disability." Andrew M., 490 F.3d at 350.

However, "when a district court finds a child was provided with appropriate IDEA services" the district court "need not reach the Section 504 claim." L.M. ex rel. M.M. v. Downingtown Area Sch. Dist., 2015 WL 1725091, *26 (E.D. Pa. Apr. 15, 2015); See also Christen G. by Louise G. v. Lower Merion Sch. Dist., 919 F. Supp. 793, 821 (E.D. Pa. Feb. 21, 1996).

In the instant case, Parent argues that the necessary elements of a Section 504 claim are satisfied because Jack is disabled as defined by the act, is qualified to participate in school activities, the school receives federal funding, and Jack was "excluded from participation in, denied the benefits of, or subject to discrimination at the school." (Parent Complaint, ¶¶ 76-79.) In a footnote in Parent's brief, Parent argues "[b]ecause the District violated IDEA by failing to provide and implement appropriate IEPs, it also violated Section 504…." (Parent Complaint, ¶¶

76-79); (Parent Brief at n.7.)  Therefore, Parent makes clear that she is not alleging additional discrimination apart from the IDEA claim.  According to Third Court precedent, Parent's argument is waived or abandoned by this Court's determination that the District provided Jack a FAPE.   Therefore, this Court affirms the Hearing Officer's decision that there is no violation of Section 504.

### iii. *Must this Court dismiss Parent's ADA claim for failure to exhaust administrative remedies?*

Parent contends that because the "substantive standards for determining liability under [Section 504] and the ADA are the same…the District violated the ADA as well."  (Parent Complaint, ¶¶ 81-82); (Parent Brief at n.7.)  Parent did not allege an ADA violation during the administrative process and is raising the ADA claim for the first time before this Court.[10]

"In a normal case, exhausting the IDEA's administrative process is required in order for [the IDEA] to "grant[ ] subject matter jurisdiction to the district court [ ]."  Batchelor v. Rose Tree Media Sch. Dist., 759 F.3d 266, 272 (3d Cir. 2014) (citing Komninos v. Upper Saddle River Bd. of Educ., 13 F.3d 775, 778 (3d Cir. 1994)).  In Batchelor, the Third Circuit interpreted the following statutory provision relating to the IDEA's exhaustion requirement:

> [n]othing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under…the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101-12214]…except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the [IDEA administrative process] shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

---

[10] In Parent's reply brief, Parent alleges that the Office of Dispute Resolution ("ODR") "does not address or resolve claims raised under the ADA."  Parent references the ODR Dispute Resolution Manual.  After a thorough review of applicable case law and the referenced ODR manual, this Court rejects Parent's allegation.  The manual referenced by Parent states "[a] parent…may request a due process hearing with respect to any matter relating to the identification, evaluation, or educational placement of a student with a disability, or the provision of a FAPE to an individual student with a disability" and "[t]he IDEA and its  implementing regulations require that a party exhaust administrative remedies for claims raised under the…Americans with Disabilities Act…if the party is seeking relief that is available under the IDEA, before filing a civil action."  Pennsylvania Special Education Dispute Resolution Manual (2017 Version), 29, 51, http://ord-pa.org/wp-content/uploads/pdf/Dispute-Resolution-Manual.pdf.

Batchelor, 759 F.3d at 272 (quoting 20 U.S.C. § 1415(l)).  The court reasoned that "determining if the IDEA's administrative process must be exhausted before bringing claims in federal court turns on whether the parties could have asserted the claims under the IDEA," and "whether the claim could have been remedied by the IDEA's administrative process."  Batchelor, 759 F.3d at 273.  Accordingly, the court held "claims made pursuant to the IDEA require exhaustion, as do any claims asserted under Section 504 and the ADA, if they seek relief that is available under the IDEA."  Id.

In the instant case, Parent alleges an ADA violation based solely on the contention that Jack was denied a FAPE.  The relief sought by Parent on all claims, including the ADA claim, is a compensatory education, which is available under the IDEA.  Parent's ADA claim falls squarely within the realm of claims that must be exhausted by the administrative process set forth in the IDEA.  Therefore, Parent's failure to exhaust the ADA claim by not raising it during the administrative process requires this Court to dismiss Parent's ADA claim for lack of subject matter jurisdiction.

### iv. *Attorney's Fees and Costs*

A court may award attorneys' fees to a "prevailing party" who brought suit under the IDEA.  20 U.S.C. § 1415(i)(3)(B)(i)(l).  Because Parent did not "prevail," this Court declines to award attorneys' fees.  See, e.g., Hannah L. v. Downingtown Area Sch. Dist., 2014 WL 3709980, at *8 (E.D. Pa. July 24, 2014).

### v. *Conclusion*

For the reasons explained above, Parent's Motion for Judgement on the Administrative Record will be denied, and the District's Motion for Judgement on the Administrative Record will be granted.